James D. Price and Florence L. Price v. Commissioner.
Price v. Commissioner
Docket No. 66845.
United States Tax Court
T.C. Memo 1958-124; 1958 Tax Ct. Memo LEXIS 99; 17 T.C.M. (CCH) 660; T.C.M. (RIA) 58124; June 30, 1958
*99 Held, of the amounts received by petitioners during the years in issue, pursuant to the terms of two agreements executed October 27, 1953, no part of the receipts were for the sale of property and all of the proceeds constituted rent receipts taxable as ordinary income. John C. Ristine, Esq., 822 Southern Building, Washington, D.C., for the petitioners. James A. Scott, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion
*100 HARRON, Judge: The Commissioner determined deficiencies in income tax for the taxable years 1953, 1954, and 1955 in the amounts of $369.24, $428.54, and $599.66, respectively. The only issue is whether sums received in 1954 and 1955 from sublessees of a business property represent ordinary income, as the Commissioner has determined, or capital gain as the petitioners contend. Findings of Fact Petitioners filed a joint return for the year 1953 with the district director of internal revenue for the district of Maryland at Baltimore, Maryland. They filed an amended return for the year 1953 and joint returns for 1954 and 1955 with the district director of internal revenue for the district of Virginia at Richmond, Virginia. On April 30, 1943, petitioners leased a property located at 1100-1102 11th Street, S. E., Washington, D.C., from Conrad J. Herzog and Elizabeth A. Herzog, his wife, for a period of 10 years. Before the end of the lease, petitioners entered into a new lease agreement dated March 20, 1946, with respect to the property for a total rental of $54,000, payable monthly at the rate of $300, for a period of 15 years. The lease stated that it was for a period of 15 years, *101 commencing on January 1, 1946, but the termination date is stated to be December 31, 1961, making a period of 16 years. This lease cancelled the earlier lease. Under the terms of the new lease, petitioners were required to make improvements within the first 5 years of the lease in the amount of at least $8,000. The lease provided that the petitioners could sublease or assign the lease without consent, but in all events they would remain liable for the payment of the rent. In 1950, petitioners expended $10,100 for the construction of a cinder block, stucco-faced building improved as a modern two-bay gasoline service station. Sometime in 1952, petitioners became interested in a new service station near their home in Virginia and decided not to operate the station in Washington, D.C. On October 27, 1953, petitioner, James D. Price, as lessor, entered into an agreement covering the 11th Street service station with his brother, Paul L. Price, as lessee. The instrument was entitled as a lease but actually it was a sublease. The sublease was for a term of 5 years commencing November 1, 1953, and ending on October 1, 1958, at a total rental of $18,000 payable in equal monthly installments *102 of $300. This agreement provided that the "lease" could not be sublet or assigned, in whole or in part, except with the written consent of the "lessor." At the same time, petitioner, James D. Price, and his brother, Paul L. Price, executed another instrument, entitled "GOODWILL AGREEMENT," which provided: "WITNESSETH, that for and in consideration of Goodwill, Subletting lease agreement entered into this day, Paying Part of building built by Party of first Part and for all other good use of the Property located at 1100-1102 Eleventh Street S.E. in the District of Columbia. Party of Second Part agrees to pay to Party of First Part the sum of twenty-one thousand ($21,000) dollars, payable three hundred fifty ($350.00) dollars the first day of November, 1953 and three hundred fifty ($350.00) dollars on the first day of each month for sixty (60) months or until the full twenty one thousand ($21,000) dollars are paid in full." Under the terms of the two instruments, Paul L. Price was required to make payments to the petitioner totaling $650 per month. On the same day, Paul L. Price executed an agreement with John R. Hodges. Under this instrument, Paul L. Price purported to assign *103 his interest in the sublease and "goodwill" agreement to John R. Hodges for the sum of $2,000. The instrument is herein set forth: "AGREEMENT "For the Sum of Two Thousand ($2,000) dollars, I. Paul L. Price, agree to assign in full, attached Lease Agreement and Goodwill Agreement from James D. Price to me, to John R. Hodges. "I, John R. Hodges, agree to keep and fulfill all parts of this Lease Agreement and Goodwill Agreement. "If any part of either Agreement is not fulfilled, this Agreement becomes null and void, except Paul L. Price has right to collect as mentioned in Lease and Goodwill Agreement. "IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals, all in quintuplet the day and year first hereinbefore written. "Witnesseth: "/s/ James D. Price "/s/ Paul L. Price Paul L. Price "/s/ John R. Hodges John R. Hodges" Prior to the execution of the two instruments on October 27, 1953, the petitioner had operated the service station at the 11th Street location since 1943. His sales of gasoline were approximately 40,000 gallons a month. After the agreements were executed, petitioner removed all of the inventory from the service station. *104 He removed and sold separately certain of the equipment that had been used in the operation of the station. He retained the accounts receivable. On November 1, 1953, John R. Hodges commenced operating the station and paid directly to the petitioner the total amount of $650 on a monthly basis. On September 8, 1954, petitioner entered into an agreement with John R. Hodges and Ida Cosman which was entitled "Extension of Lease and Goodwill Agreement" in which petitioner was referred to as lessor, and John R. Hodges and Ida Cosman as lessees. This agreement purported to be an extension of the two previous agreements dated October 27, 1953, made between petitioner and his brother. The instrument covered the remainder of the term of petitioners' lease with the Herzogs and was for the same monthly payments of $300 and $350, as provided in the October 27, 1953 agreements. The extension was to run for 38 months, commencing on the first day of November 1958 and terminating on December 31, 1961, the day petitioners' lease with the Herzogs will terminate. The instrument provided that under the extension of the "Goodwill Agreement," the lessees were to pay $13,300, payable at the rate of $350 *105 a month. Petitioners, in their return for 1953, reported the proceeds from the two October 27, 1953 instruments as rental income. On June 14, 1955, petitioners amended their 1953 return and reported the payments under both agreements as proceeds from the sale of a capital asset and reported them as long-term capital gains. In their returns for 1954 and 1955, petitioners treated the payments from the two instruments as long-term capital gains and reported net lon-gterm capital gain in the respective amounts of $4,166.25 and $4,198.01, computed as follows: 1954
1955
Gross Sales Price
$7,800.00
$7,800.00
Cost or Other Basis
3,633.75
3,601.99 *
$4,166.25
$4,198.01
The notice of deficiency for 1953 was based upon the original joint return and none of the adjustments relate to the income from the service station. Petitioners concede their liability for the deficiency determined by the *106 respondent for 1953 in the amount of $369.24. In the notice of deficiency for the year 1954, respondent included in taxable income the amount of $3,312.73 for "rent from subleased gas station," with the following explanation: (1) It is held that you received taxable income of $3,312.73 from the subleasing of gasoline station, computed as follows: Income received from sublease
$7,800.00
Expense of lease: Rent paid
$3,633.75
Amortization of improve-
ments - $10,100.00 X 12/142
853.52
4,487.27
Adjustment
$3,312.73
In the notice of deficiency for the taxable year 1955, respondent included in income the amount of $3,344.49 for "rent from subleased station," with the following explanation: (4) It is held that you received taxable income of $3,344.49 from the subleasing of gasoline station, computed as follows: Income from sublease
$7,800.00
Expense of lease: Rent paid
$3,601.99
Amortization of improve-
ments - $10,100.00 X
12/142
853.52
4,455.51
Adjustment
$3,344.49
In determining the deficiencies for the taxable years 1954 and 1955, respondent made consistent reductions of the long-term capital gains which had *107 been reported by the petitioners from payments made under the two instruments covering the 11th Street service station property. Under two instruments dated October 27, 1953, executed by petitioner and his brother, the petitioner subleased a service station, and the net amounts received in the years 1954 and 1955, $3,312.73 and $3,344.49, respectively, were net rental income, taxable as ordinary income. Petitioners failed to prove that they sold a business or goodwill, and, also, they failed to prove any value for a business or goodwill. The stipulated facts are found as stipulated. Opinion The sole question to be decided is whether petitioner, James D. Price, subleased a service station which he held under a lease, so that all income derived therefrom was rental income taxable in full, as respondent has determined, or whether he sold or exchanged a capital asset so as to be entitled to report the proceeds as capital gains within the meaning of section 117 of the 1939 Code and section 1221 [1] of the 1954 Code. The respondent contends that under the two instruments of October 27, 1953, petitioner subleased a service station and that the proceeds are rental income taxable as *108 ordinary income. Petitioners contend they made a sale of certain rights and interests owned by them in a service station. Both the respondent and petitioners cite recent cases decided by this Court. The respondent relies on (No. 116), on appeal C.A. 9, June 11, 1958, and argues that it is similar to this case. The petitioners cite (No. 120). In , the taxpayers were lessees under a 10-year lease at a monthly rental of $1,600. They occupied the premises *109 as lessees for one year and made certain improvements to the property. The taxpayers then entered into an agreement with a third party. This agreement was also executed by the original lessor. The third party became the sublessee of the taxpayers and obligated itself to pay $50,000 per year for the balance of the original lease, which was 9 years. The third party paid $1,900 per month to the original lessor and $2,266.67 per month to the taxpayers. The taxpayers reported this as long-term capital gain. They contended that the transaction resulted in a sale to the third party of their leasehold interest in the premises. The taxpayers, in support of their position, relied upon our decisions in ; , affd. , certiorari denied ; , affd. , certiorari denied ; and , affd. , certiorari denied . In the Voloudakis case, we discussed each of the above-cited *110 cases and distinguished them as cases where "the lessee sold, transferred, conveyed, or relinquished his leasehold rights for a stated consideration under a written instrument which clearly demonstrated the intention of the parties to effect an absolute transfer or sale of the rights of the lessee in the property," and we held that the agreement was not a sale. The agreement referred to the payments as rentals and was denominated a lease. In that case, as here, the taxpayer remained liable under its original lease. We held, therefore, that there could not have been an assignment of the lease, for an assignment of the lease frees the assigned lessee of liability for rent or further performance of any of the covenants of the lease. We make the same conclusion here. Under a sublease, the lessee does not dispose of the entire term of his lease. He remains liable to his landlord for payment of rent and for performance of other covenants of the lease, unless specifically released therefrom. 1 Tiffany, Real Property, sec. 124 (3d ed. 1939). The petitioner here never parted with his title and interest in the lease and all that the sublessee acquired was a right to use the property without *111 the possibility of ever acquiring any title or equity in the property. See . The petitioners rely upon , and it is necessary to distinguish this case. The taxpayer there was a distributor of petroleum products. In order to have outlets for its products it bought or leased service stations, and leased or subleased them to individuals upon the condition that the operator would purchase their petroleum products. Whenever the taxpayer purchased a service station, the purchase agreement recited in dollars the consideration paid for the goodwill of the service station. When the taxpayer leased the station, the lessee was required to purchase the goodwill and was required to pay exactly the amount paid by the taxpayer for the goodwill. The taxpayer required the operator to sign a lease which was separate from the purchase of the goodwill. The total sum paid for the goodwill was not pro-rated over the term of the lease, or paid in monthly amounts, but was paid in a lump sum. A condition preceding the execution of each lease, or sublease, was the requirement that the operator pay a specific *112 sum for the goodwill of the service station business being turned over to him. The Commissioner determined that these payments for the purchase of goodwill were really prepayments of rent. We held that making payments of this kind for goodwill is an established practice in New York with respect to service stations. The amounts were separately negotiated; the parties described the amounts as payments for the goodwill of the stations. The taxpayers did not make any profit on the disposal of the goodwill because they disposed of the goodwill of each station for exactly the same price as they paid when acquiring a service station. We also held that the rentals were not too low. In the Chatsworth case, the evidence showed that it was the custom to sell the goodwill of operating service stations. The cost of the goodwill to a taxpayer was known, and the disposal of the goodwill to the operators was separately negotiated and paid for at once. On its facts the Chatsworth case is distinguishable from this case. In the situation before us, the "goodwill" agreement did not dispose of a business but merely subleased the service station. The petitioners paid $300 a month rent for a property which *113 did not have a modern service station on it. After petitioner constructed a modern service station costing $10,100, it does not seem reasonable or logical to us that $300 could be considered as a reasonable rental for the improved service station. Rather, in our view of the entire record, it is our opinion that $650 per month constituted reasonable rent for the property. We think that the petitioner would not have subleased a profitable service station upon which he had placed valuable improvements at the same rental payable to the lessor. No matter how denominated, it is held that the amounts received under the "goodwill" agreement were actually rental payments. See . Under the agreements which petitioner entered into with his brother, petitioner received the net amounts of $3,312.73 in 1954 and $3,344.49 in 1955. It is held that the entire net amount received in each year constituted ordinary income. Respondent's determination is sustained. The petitioner made no attempt to prove the value of any goodwill which he may have transferred. The record shows that rather than make a sale of a going business with goodwill, petitioner chose *114 to sublease the service station. The petitioner did not sell his equipment or inventory to his brother. Also, he retained the accounts receivable. It may be that the parties contemplated some transfer of goodwill, but without any proof of its value, or that any goodwill existed, we cannot say that any part of the monthly payments under the two instruments represented proceeds from the sale of goodwill, or of any other capital asset. Decision will be entered for the respondent. Footnotes
*. The "cost or other basis" for each year includes "lease ground rent" of $3,600, which was the rental required to be paid by petitioners under their lease from the Herzogs, and interest in the amounts of $33.75 and $1,99 for the years 1954 and 1955, respectively.↩
1. SEC. 1221. CAPITAL ASSET DEFINED. For the purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * * [The above section of the 1954 Code is essentially the same as section 117 of the 1939 Code.]↩